AO 91 (Rev. 11/11)   Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT

4/21/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: EC DEPUTY

# UNITED STATES DISTRICT COURT
for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

04/21/26

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) |
| JERREL DEMMOREST MANGHAM, | ) Case No.  5:26-mj-00249-DUTY |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____ May 6, 2025 _____ in the county of _____ Riverside _____ in the
_____ Central _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o)(1) | Possession of Machineguns |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Rick Mistic, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  April 21, 2026

*Judge's signature*

City and state:          Riverside, CA

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

*AUSA:*  Peter Dahlquist

## AFFIDAVIT

I, Rick Mistic, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Jerrel Demmorest Mangham ("MANGHAM") for a violation of 18 U.S.C. § 922(o)(1) (Possession of Machineguns) on or about May 6, 2025.

2.    This affidavit is also made in support of an application for a warrant to search 1666 Pinehurst Drive, Upland, California (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of MANGHAM, as described more fully in Attachment A-2, for evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(o)(1) (Possession of Machineguns) and 922(a)(1)(A) (Engaging in the Business of Dealing Firearms without a License) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.   I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in Riverside, California.  I joined ATF in May 2024.  Before becoming an ATF SA, I was a United States Marine for 20 years.  During my career in federal law enforcement, I have received extensive training regarding federal criminal law.  My education includes a Bachelor's Degree in Criminal Justice from Saint Leo University and a Master's Degree in Forensic Psychology from Walden University.

5.   As an SA, I have completed training at the ATF National Academy and the Federal Law Enforcement Training Center related to federal firearms and narcotics laws and regulations.  I regularly refer to these laws and regulations during the course of my duties.  I have participated in the investigation, surveillance, and arrest of firearms and narcotics traffickers and prohibited persons in possession of firearms.  I have also spoken with experienced investigators concerning the methods and practices of firearms and narcotics traffickers.  I have become familiar with the illicit manner in which firearms and controlled substances are manufactured, distributed, and sold.

## III. SUMMARY OF PROBABLE CAUSE

6.   During three video and audio-recorded meetings, MANGHAM sold the following firearms to an undercover ATF agent:

2

a.   May 6, 2025: four 9mm machinegun pistols bearing no legitimate manufacturer's marks or serial numbers and six machinegun conversion devices;

b.   June 12, 2025: two 9mm pistols bearing no legitimate manufacturer's marks or serial numbers and four 9mm machinegun pistols bearing no legitimate manufacturer's marks or serial numbers; and

c.   August 20, 2025: two 9mm machinegun pistols bearing no legitimate manufacturer's marks or serial numbers and eight 9mm semi-automatic pistols bearing no legitimate manufacturer's mark or serial numbers.

7.   During a video and audio-recorded meeting on March 5, 2026, MANGHAM received a $1,500 deposit from an ATF undercover agent to manufacture four 9mm machinegun pistols bearing no legitimate manufacturer's marks or serial numbers and four 9mm semi-automatic pistols bearing no legitimate manufacturer's mark or serial numbers.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   MANGHAM Sells Machinegun Conversion Device to CI**

9.   In March 2025, Ontario Police Department Detective Melnyk contacted an ATF agent, who also sometimes works in an undercover capacity ("UC1"), regarding a Confidential Informant (the "CI") who purchased a Privately Made Firearm ("PMF"), or a

firearm bearing no legitimate manufacturer's marks or serial numbers, with a machinegun conversion device from MANGHAM.

10.  Detective Melnyk then instructed the CI to provide MANGHAM with contact information for the UC1 as a prospective firearm purchaser.

11.  Detective Melnyk then provided UC1 with MANGHAM's telephone number.  UC1 then contacted MANGHAM and arranged a meeting in the Riverside, California area.

12.  Using the information provided by the Ontario Police Department, I queried the last name MANGHAM in law enforcement databases, which associated the name with "Jerrel Demmorest Mangham" (with a year of birth in 1994).

13.  On March 27, 2025, SA Mistic and a surveillance team consisting of ATF Special Agents, ATF Task Force Officers, and officers assigned to Ontario Police Department met at an ATF controlled undercover location (the "UC location") in the Riverside, California area.  The UC location is equipped with covert audio and video recording equipment.

14.  On the same date, at approximately 1:00 PM, MANGHAM indicated via recorded phone call to UC1 that he was outside the UC location.  MANGHAM was driving a white KIA four-door sedan, bearing California license plate ending in 128 (the "KIA").  UC1 then opened the front door and greeted MANGHAM as MANGHAM entered the UC location.  UC1 then introduced MANGHAM to a second undercover agent ("UC2").

15.  During the meeting, MANGHAM informed UC1 and UC2 that he can manufacture and sell pistols, switches, AR-style rifles

4

and pistols, and auto sears with a turnaround time of approximately two to three weeks.[1]  UC1 stated that he would be in touch soon to place an order for these items.

16.  At approximately 1:22 PM, UC1 and UC2 escorted MANGHAM back to the front door where he departed, got into the KIA and departed the UC location.

### B.    MANGHAM Sells Machineguns to ATF UC on May 6, 2025

17.  Between March 28, 2025, and May 6, 2025, UC1 and MANGHAM exchanged a series of messages and recorded phone calls. During these calls and messages, MANGHAM used a telephone number ending in 1235.

18.  On March 28, 2025, at approximately 12:45 PM, UC1 placed a telephone call to MANGHAM.  During the call, UC1 placed an order for privately made firearms from MANGHAM.  UC1 ordered four fully automatic pistols, and four AR-15 type drop-in auto sears, or machine gun conversion devices.

19.  On April 4, 2025, MANGHAM initiated an exchange of messages with UC1.  During the exchange, MANGHAM advised that the manufacturing of the firearms for UC1 was delayed because he was "dealing with other ventures at the same time."

20.  On April 18, 2025, MANGHAM initiated another exchange of messages with UC1.  During the exchange, MANGHAM asked UC1 to place a $300 deposit to secure the order.  MANGHAM referred to the $300 as a "service fee."  As the conversation continued,

---

[1]"Switches" and an "auto sears" are devices that are used convert semi-automatic firearms into firearms that shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

5

MANGHAM advised that his CashApp handle was "$RellzFourGz" for the deposit.  MANGHAM then advised that two of the privately made pistols were almost finished.

21.  On April 21, 2025, during another exchange of text messages, UC1 advised that he had sent MANGHAM $299 (in ATF funds) ($1 fee for cash transfer) via CashApp as a deposit for the firearms order.

22.  On April 25, 2025, MANGHAM initiated an exchange of messages with UC1.  During the exchange, MANGHAM indicated that he had almost completed the order and was waiting for some of the parts to be delivered.  MANGHAM also sent a screenshot of the shipment tracking for the remaining parts he had ordered.  Also during the exchange, MANGHAM quoted a sale price of $3,400 for the four fully automatic pistols and four machine gun conversion devices.  MANGHAM further advised that UC1 would owe a total of $3,100 because he had made the $299 down payment.

23.  On April 30, 2025, during another text exchange, MANGHAM offered to sell an additional pistol and UC1 agreed.

24.  On May 4, 2025, MANGHAM, via text message, advised that he was waiting on parts to complete the fifth pistol he had offered for sale.  MANGHAM further advised that he would not have the fifth pistol completed prior to the transaction he and UC1 had scheduled for May 6, 2025.

25.  On May 6, 2025, at approximately 11:00 AM, UC1 and a surveillance team consisting of ATF Special Agents, ATF Task Force Officers, and Ontario Police Department Officers met at the UC location.

26.  On the same date, at approximately 12:22 PM, MANGHAM contacted UC1 via recorded telephone call and indicated that he was near the UC location.  UC1 then directed MANGHAM to the garage door area of the UC location.  MANGHAM arrived driving the KIA.

27.  MANGHAM was carrying a backpack as he exited the KIA to exchange greetings with UC1.

28.  MANGHAM indicated that he had brought the firearms in pieces and would start putting the firearms together.

29.  MANGHAM then began removing items from his backpack. MANGHAM then retrieved another bag from the trunk of his vehicle.  While doing so, MANGHAM advised that he keeps the firearm parts separate so he "doesn't get charged for a full gun."

30.  MANGHAM advised that he asked for the $300 payment up front to "test" UC1.

31.  MANGHAM advised that the fifth pistol he had offered for sale was not finished yet.

32.  MANGHAM handed UC1 a clear plastic baggie containing five drop-in auto sear machine gun conversion devices for AR-15 type rifles and one pistol machine gun conversion device, commonly referred to as a "switch."  MANGHAM advised that he was providing one extra auto sear and one extra switch at no cost.

33.  MANGHAM indicated that the auto sears had been tested and functioned as intended.  MANGHAM elaborated that each auto sear needs to be broken in with the specific firearm it is to be used with.

34.  MANGHAM indicated that following the transaction he would send UC1 instructions on how to install and break in the machine gun conversion devices.

35.  As the conversation continued, MANGHAM advised that the pistols have the machine gun conversion devices attached. MANGHAM further advised that the pistols need to be fired to be broken in and function fully automatic.  MANGHAM elaborated that the pistols would shoot several rounds while holding the trigger down but will sometimes jam.  MANGHAM indicated that they will not jam once fired more and broken in.

36.  MANGHAM referred to the pistol machine gun conversion devices as "incognito" because they are hidden and appear to be a normal back plate to a semi-automatic pistol.

37.  MANGHAM indicated that he uses caution when test firing the fully automatic firearms so that law enforcement does not hear it.

38.  UC1 paid MANGHAM the remaining balance due of $3,100 using ATF funds for the purchase of four fully automatic pistols and six machine gun conversion devices.

39.  MANGHAM advised that he outsources the manufacturing of his AR-15 type rifle lower receivers.  MANGHAM further advised that his associate who manufactures the lower receivers for him is currently not making them.

40.  At approximately 12:41 PM, the conversation ended. MANGHAM then entered the KIA and departed the UC location.

41.  I reviewed the video of this transaction from the UC location and can clearly see MANGHAM's face.

8

C.    **MANGHAM Sells Machineguns to ATF UC on June 12, 2025**

42.   Between May 17, 2025, and June 12, 2025, UC1 and MANGHAM exchanged a series of messages and recorded phone calls. During these calls and messages, MANGHAM used a telephone number ending in 1235.

43.   On May 17, 2025, MANGHAM initiated an exchange of text messages with UC1.  During the exchange, MANGHAM offered a privately made pistol, which he described as a "BB PROP REPLICA" for sale for $700.  UC1 replied that he would be placing an order for more firearms soon.

44.   On May 19, 2025, UC1 initiated an exchange of text messages with MANGHAM.  During the exchange, UC1 indicated he was interested in purchasing three rifles with machine gun conversion devices installed.  UC1 further indicated that he wanted to purchase the pistol that MANGHAM had previously offered for sale.  As the conversation continued, MANGHAM advised that he would need to speak with his associate to see if he is still manufacturing the rifle lower receivers for him.

45.   On May 20, 2025, MANGHAM initiated an exchange of text messages with UC1.  During the exchange, MANGHAM advised that his associate does not have any of the rifle lower receivers in stock and for this reason, MANGHAM could only provide pistols for sale at this time.

46.   On May 23, 2025, MANGHAM initiated another exchange of text messages with UC1.  During the exchange, MANGHAM offered what appeared to be the same privately made pistol for sale, this time at a reduced price of $600.  UC1 replied that he would

9

purchase the pistol and placed an order for four more pistols with two of the pistols being fully automatic.  MANGHAM replied that he could fulfill the order, however, he would need a deposit of $800.

47.  On May 25, 2025, MANGHAM offered another privately made pistol for sale, which he also referred to as a "BB PROP REPLICA" for $700.

48.  On May 30, 2025, MANGHAM offered another privately made pistol, which he referred to as a "BB PROP REPLICA" and "FULL ACTIVATED" for $900.

49.  On June 3, 2025, UC1 initiated an exchange of messages with MANGHAM.  During the exchange, UC1 advised that he would be sending MANGHAM a deposit for the firearms.  UC1 confirmed that he would be purchasing five privately made pistols, two of which will be fully automatic to which MANGHAM acknowledged.  MANGHAM then offered to convert a third or fourth firearm to fully automatic.  UC1 advised that he would take a third pistol as fully automatic.  Shortly thereafter, UC1 sent $798 in ATF funds to MANGHAM's CashApp account, "$RellzFourGz."  MANGHAM confirmed a total sale price for the five firearms would be $3,800.

50.  On June 9, 2025, MANGHAM initiated an exchange of messages with UC1. During the exchange, MANGHAM indicated that he was almost finished manufacturing the firearms.  MANGHAM then advised that he was able to build a sixth pistol which was also fully automatic.  UC1 advised that he would purchase the sixth pistol as well.  MANGHAM adjusted the total sale price for all the firearms to $4,600, including the $800 deposit which had

10

already been paid.  UC1 then arranged to conduct the transaction with MANGHAM in the afternoon of June 12, 2025, at the UC location.

51.  On June 12, 2025, at approximately 2:20 PM, MANGHAM indicated to UC1 that he was outside the UC location.  UC1 then opened the rear garage door, to allow MANGHAM to pull his vehicle into the bay.  MANGHAM was driving the KIA.

52.  At approximately 2:28 PM, the surveillance team observed UC1 purchase six privately made firearms, or PMFs, four of which were converted into machineguns with suspected "incognito" machinegun conversion devices, from MANGHAM for an additional $3,800.  At the end of the transaction, at approximately 2:30 PM, surveillance units saw MANGHAM enter the KIA and depart the UC location.

**D.   MANGHAM Sells Machineguns and Pistols to ATF UC on August 20, 2025**

53.  Between June 18, 2025, and August 20, 2025, UC1 and MANGHAM exchanged a series of messages.  During these calls and messages, MANGHAM used a telephone number ending in 1235 and a telephone number ending in 8413.

54.  On June 23, 2025, UC1 initiated an exchange of messages with MANGHAM.  During the exchange, UC1 placed an order for eight more semiautomatic privately made pistols.  During a brief negotiation, MANGHAM quoted a sale price of $750 per "special edition" pistol and $700 each for the other pistols. As the conversation continued, MANGHAM offered to manufacture

11

ten pistols, including two fully automatic, at a rate of $700 per pistol with a $700 deposit.

55.  On June 28, 2025, during another exchange of messages, MANGHAM advised that he had acquired half of the parts necessary to complete the order of ten pistols.  MANGHAM also asked for the deposit again.

56.  On July 11, 2025, UC1 and MANGHAM arranged to meet so that UC1 could pay MANGHAM the $700 deposit.  That afternoon, during a UC meeting, UC1 paid MANGHAM $700 in ATF funds as a deposit towards the purchase of ten pistols.

57.  On August 5, 2025, MANGHAM initiated an exchange of text messages with UC1.  During the exchange, MANGHAM indicated that he had completed building all ten firearms.

58.  On August 18, 2025, UC1 arranged to purchase ten firearms from MANGHAM on the afternoon of August 20, 2025, at the UC location.

59.  On August 20, 2025, at approximately 11:00 AM, at approximately 12:01 PM, MANGHAM indicated via phone call to UC1 that he was outside the UC location.  UC1 then opened the rear garage door, to allow MANGHAM to enter.  MANGHAM was riding in the front passenger seat of a red 4 door Hyundai SUV (unknown license plate number and registered owner), who he stated belonged to his "girl" (unidentified) when he arrived.  MANGHAM was also carrying a safe when he entered the location that he removed from the trunk of the red Hyundai.

60.  At approximately 12:09 PM, the surveillance team observed a different undercover agent ("UC3") purchase ten

12

privately made firearms, two of which were converted into machineguns with suspected "incognito" machinegun conversion devices, from MANGHAM for an additional $6,300 ($7,000 total with $700 paid in advance).

61. At approximately 12:13 PM, surveillance units observed MANGHAM enter the red 4-door Hyundai SUV and depart the UC location.

62. I reviewed the video of this transaction from the UC location and can clearly see MANGHAM's face.

**E.    MANGHAM Offers to Sell Machineguns to UC in January 2026**

63. On January 30, 2026, UC1 initiated a conversation with MANGHAM via recorded text message and asked him how he was doing, which MANGHAM responded that he was doing well.

64. UC1 informed MANGHAM that he is ready to place another order for more firearms, which MANGHAM replied that due to the change in law it may take longer to fulfill future orders.

65. UC1 then asked MANGHAM how long he expected it to take to fill the firearm order.  MANGHAM responded that he may be able to complete the order by the end of February or March.

66. UC1 stated that he wants to order ten more.  MANGHAM replied that he would work on that.

67. On February 2, 2026, UC1 initiated a conversation with MANGHAM via recorded text message and asked how much 10 fully automatic firearms would cost?  MANGHAM responded that he would have to figure it out due to the increasing price because of the risk involved.  MANGHAM added that "People are now charging 850+

13

for their UGLY basic semis", and that his "BB" semis will be selling for $900 and his "sport mode" (fully automatic) firearms will sell for approximately $1,200.  MANGHAM then informed UC1 that since they are in good standing that UC1 would only be charged $750 for a "BB semi" and $1,000 for each "sport edition" (fully automatic) firearm.

68.  UC1 then told MANGHAM that he would like to order six semi and four sport.  MANGHAM then replied that he is still figuring things out and is looking for a new source but would let him know when he is ready.

69.  February 13, 2026, UC1 initiated a conversation with MANGHAM via recorded text message and asked if he had any update on his order.  MANGHAM told UC1 to give him until February for an update.

### F.   MANGHAM Receives Deposit from UC for Parts to Build Machineguns on March 5, 2026

70.  Between January and March of 2026, UC1, acting in an undercover capacity, communicated with MANGHAM regarding placing another order of firearms.  MANGHAM agreed to meet UC1 on March 5, 2026, to receive a deposit for the parts needed to complete the firearms order.

71.  On March 5, 2026, at approximately 1:00 PM, a surveillance team consisting of ATF Special Agents and Task Force Officers met on Foothill Blvd, Rancho Cucamonga, California, to monitor the controlled purchase.  UC1 was provided $1,500 in ATF funds for the deposit of eight privately made firearms from MANGHAM.  SA Renteria, SA Antonino, SA Top,

14

SA Keegan, SA Kirker, TFO Melnyk, TFO Galbreath, and Resident Agent in Charge Kempton provided surveillance and cover throughout the operation.

72. On the same date, at approximately 1:07 PM, UC1, UC2, and UC3, each acting in an undercover capacity, arrived at the meeting location on Foothill Blvd, Rancho Cucamonga, California, in a UC vehicle equipped with covert audio and video recording devices. At the same time, UC1 called MANGHAM via recorded phone call to let MANGHAM know the UC1 arrived.

73. At approximately 1:08 PM, MANGHAM approached the UC vehicle, where UC1 exited the driver's seat and exchanged greetings with MANGHAM.

74. MANGHAM then explained how the recent gun laws have made it more difficult to acquire the parts needed to complete the firearms order, which is why MANGHAM's prices have raised.

75. At approximately 1:09 PM, UC1 gave MANGHAM $1,500 for the deposit.

76. MANGHAM then informed UC1 that the firearms order should be complete "between and month and a month and a half".

77. At approximately 1:09 PM, the conversation ended and UC1 entered the UC vehicle.

78. I reviewed the video of this transaction from the UC location and can clearly see MANGHAM's face.

**G.   Investigation of the SUBJECT PREMISES**

79. Based on a search of records from the California Department of Motor Vehicles, I learned that MANGHAM reported

the SUBJECT PREMISES as his residence.  I also learned that MANGHAM had a vehicle registered to him at the SUBJECT PREMISES.

80.  On April 16, 2026, at approximately 7:00 AM to 8:00 AM, TFO Joseph Melnyk conducted surveillance at the SUBJECT PREMISES.

81.  On April 16, 2026, at approximately 7:42 AM, TFO Melnyk observed MANGHAM depart the SUBJECT PREMISES from the front door, walk through a breezeway to the street where he entered a Nissan sedan.  TFO Melnyk saw MANGHAM wearing a white shirt and yellow shorts.

82.  On April 16, 2026, at approximately 4:30 PM, TFO Melnyk returned to the SUBJECT PREMISES and heard sounds coming from the garage of the SUBJECT PREMISES that sounded to him like drilling.

83.  As outlined further below, a person like MANGHAM who secures deposits and states he has shipment tracking for the parts he had ordered will likely have firearms parts, and information relating to firearm part shipments, at his residence.

**H.    Firearms and Ammunition Technology Division Confirms the Firearms Seized on May 6, 2025, are "Machineguns"**

84.  On or about July 7, 2025, an ATF Firearms Enforcement Officer, Cody J. Toy from the Firearms & Ammunition Technology Division, signed a Field Response Branch Report of Technical Examination after examining the four 9mm machinegun pistols bearing no legitimate manufacturer's marks or serial numbers and six machinegun conversion devices that ATF seized on May 6,

16

2025.  As outlined in greater detail in the report, Officer Toy concluded that the (1) 9mm machinegun pistols are machineguns as defined in 26 U.S.C. § 5845(b)and (2) the six machinegun conversion devices are machineguns as defined in 26 U.S.C. § 5845(b).

**I.    Firearms and Ammunition Technology Division Confirms the Firearms Seized on June 12, 2025, are "Machineguns"**

85.  On or about September 17, 2025, an ATF Firearms Enforcement Officer, Chad Baker from the Firearms & Ammunition Technology Division, signed a Field Response Branch Report of Technical Examination after examining four 9mm machinegun pistols bearing no legitimate manufacturer's marks or serial numbers that ATF seized on June 12, 2025.  As outlined in greater detail in the report, Officer Baker concluded that the (1) 9mm machinegun pistols are machineguns as defined in 26 U.S.C. § 5845(b).

**J.    Firearms and Ammunition Technology Division Confirms the Firearms Seized on August 20, 2025, are "Machineguns"**

86.  On or about October 6, 2025, an ATF Firearms Enforcement Officer, Chad Baker from the Firearms & Ammunition Technology Division, signed a Field Response Branch Report of Technical Examination after examining the two 9mm machinegun pistols bearing no legitimate manufacturer's marks or serial numbers that ATF seized on August 20, 2025.  As outlined in greater detail in the report, Officer Baker concluded that the 9mm machinegun pistols are machineguns as defined in 26 U.S.C. § 5845(b).

17

## V.  TRAINING AND EXPERIENCE ON FIREARMS TRAFFICKING OFFENSES

87.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their digital devices.

b.    Many people who engage in the business of selling firearms create images of the firearms they intend to sell, including digital photographs or recordings displaying the firearms, which may be stored on digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with

18

them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals who, as part of their business of engaging in repeated sales of firearms, manufacture firearms are also likely to have e-mail, text messages, and other records showing the purchase of parts and equipment they will use for manufacturing firearms.

e.    Individuals who, as part of their business of engaging in repeated sales of firearms, manufacture firearms are also likely to have firearms making equipment at their residence or evidence related to where the individuals manufacture firearms.

f.    Additionally, individuals who, as part of their business of engaging in repeated sales of firearms, manufacture firearms are also likely to have records relating to the purchase of firearms parts.  Such records might include invoices, which can be stored electronically, and records related parcels or packages of parts that are used when individuals manufacture firearms.  These records are likely to be found at the mailing address of persons who are manufacturing firearms.

g.    Individuals engaged in the illegal sale of firearms may use multiple digital devices.

19

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

88.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

89. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

21

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

90.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

22

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MANGHAM's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MANGHAM's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

91.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

92.  For all of the reasons described above, there is probable cause to believe that MANGHAM has committed a violation of 18 U.S.C. § 922(o)(1) (Possession of Machineguns) on or about May 6, 2025.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of

the premises described in Attachment A-1 and the person

described in Attachment A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  21st day of
 April    , 2026.


HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE

24